RENDERED: AUGUST 24, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0018-DG

COMMONWEALTH OF KENTUCKY                                APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2020-CA-1429-MR
FAYETTE CIRCUIT COURT NO. 19-CR-01326


WILLIAM BEMBURY                                            APPELLEE


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>REVERSING</u>**

William Bembury (Bembury) entered a guilty plea to one count of possession of synthetic drugs on the condition that he could appeal the Fayette Circuit Court's denial of his motion to suppress evidence recovered from his backpack. Before the Court of Appeals, Bembury asserted that his backpack was searched in violation of his rights against unlawful search and seizure under the Fourth Amendment of the United States Constitution[1] and Section Ten of Kentucky's Constitution.[2] A split Court of Appeals panel reversed and held that no exception to the rule requiring that searches be supported by a warrant applied. The Commonwealth now appeals that ruling. After thorough

---

[1] U.S. Const. amend. IV.

[2] Ky. Const. § 10.

review, we reverse the Court of Appeals and reinstate the circuit court's order denying Bembury's motion to suppress.

## I. FACTS AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. On August 14, 2019, Officer Adam Ray (Officer Ray) was assigned to the Bureau of Special Operations, Bicycle Unit, with the Lexington Police Department. His assignment was to patrol the downtown entertainment district. At approximately 6 p.m. he and an Officer Kennedy observed an individual named Joseph Napier (Napier) approach Bembury on a sidewalk near Phoenix Park. Officer Ray was familiar with Bembury from his experience patrolling that area. He also knew Bembury to be an individual that sold synthetic marijuana based on complaints from security personnel at the Lexington Public Library as well as statements from individuals who had been arrested for possession of synthetic marijuana and reported to police that they had purchased the substance from Bembury.

Bembury and Napier had a brief conversation and then began walking away from the area together. This raised the officers' suspicions, so they followed the pair to the courtyard of the Chase Bank building down the street. Officer Kennedy watched Bembury and Napier as they sat at a picnic table in the courtyard while Officer Ray positioned himself in the first level of a parking garage next to the courtyard. Officer Ray had an unobscured view of Bembury and Napier, although they were sitting with their backs to him. Officer Ray could not recall if he used binoculars to observe them, but testified it was his habit to do so. He watched Napier give Bembury an unknown amount of U.S.

currency. Bembury then placed the money in his backpack, which was on the table in front of him. Next, Bembury took a white rolling paper out of his backpack and reached back into his backpack and took out a substance that he sprinkled into the rolling paper, rolled into a joint, and handed to Napier. Napier then put the joint into his backpack and walked away.

The officers followed and stopped Napier. They told him they had just watched his transaction with Bembury and asked him to give them the joint. Napier complied with the Officers' request and told them he had paid Bembury about five dollars for it. During the summer months, Officer Ray encountered synthetic marijuana almost every day. Based on his experience, in particular the odor and appearance of the substance in the joint, he believed it was synthetic marijuana. At that point, Officer Kennedy stayed with Napier while Officer Ray rode back to Bembury who was still sitting at a picnic table in the courtyard of the bank building. Officer Ray told Bembury he was under arrest and placed him in handcuffs. The officer then performed a cursory "look through" of Bembury's backpack, but he stopped the search and decided to wait for Officer Kennedy to arrive before conducting a more thorough search. When Officer Kennedy arrived, Officer Ray filled out paperwork while Officer Kennedy searched Bembury's backpack. During the search, Officer Kennedy found a baggie of synthetic marijuana that was approximately the size of a golf ball, a pack of rolling papers, and seven one-dollar bills. Until it was moved to perform the search, Bembury's backpack remained on the picnic table in front of him. He did not consent to the search.

3

On January 28, 2020, Bembury filed a motion to suppress the evidence recovered from his backpack. He argued that the warrantless search of his backpack violated the Fourth Amendment of the U.S. Constitution and Section Ten of Kentucky's Constitution. During the suppression hearing that followed, Officer Ray was the Commonwealth's only witness, and his testimony recounted the facts as stated above. Following supplemental memoranda from both parties, the circuit court entered an opinion and order denying Bembury's motion to suppress. The circuit court reasoned that

> [i]n [*Arizona v. Gant*],[3] the Supreme Court held a search incident to a lawful arrest encompasses the search of a vehicle and any containers found within the vehicle "when the arrestee is within reaching distance of the vehicle ***or it is reasonable to believe the vehicle contains evidence of the offense of arrest***."

The court then relied on an unpublished Court of Appeals opinion, *Agee v. Commonwealth*,[4] which applied *Gant* and upheld a warrantless search of a backpack under factually similar circumstances because the officers had a reasonable basis to believe the bag contained evidence of Agee's crime of public intoxication. Based on *Gant* and *Agee,* the circuit court found that the search of Bembury's backpack was lawful as a search incident to his lawful arrest because the officers "had a reasonable belief the backpack contained evidence of the offense of arrest."

---

[3] 556 U.S. 332 (2009).

[4] 2010-CA-001122-MR, 2014 WL 3795492 (Ky. App. Aug. 1, 2014).

4

The Court of Appeals disagreed with the circuit court's ruling and reversed.[5] The court noted that warrantless searches made incident to arrest are divided into two categories: searches of the arrestee's person and searches of the area within the arrestee's control.[6] And, that the latter category of warrantless search must be justified on the grounds of ensuring the arresting officer's safety and to prevent the destruction of evidence.[7] The court further acknowledged that in *Gant*, the U.S. Supreme Court created an independent justification for the warrantless search of an arrestee's vehicle when the arresting officer has a reasonable belief that the vehicle contains evidence of the crime of arrest.[8]

However, the court held that the search of Bembury's backpack could not be upheld as a search of the area within his immediate control because at the time of the search he was handcuffed and therefore did not have the ability to destroy evidence or pose a threat to the officers' safety.[9] Moreover, it held that the *Gant* exception allowing warrantless searches in order to recover evidence of the crime of arrest applies only to vehicle searches due to the "circumstances unique to the vehicle context."[10]

---

[5] *Bembury v. Commonwealth*, 2020-CA-1429-MR, 2021 WL 5856104, at *1 (Ky. App. Dec. 10, 2021).

[6] *Id.* at *2 (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)).

[7] *Bembury*, 2021 WL 5856104, at *2 (citing *Gant*, 556 U.S. at 339).

[8] *Id.* at *2.

[9] *Id.*

[10] *Id.* (quoting *Gant*, 556 U.S. at 343).

The Court of Appeals next addressed whether the search of Bembury's backpack could be upheld as a search of his person, noting that the "authority to search the arrestee's actual person without a warrant has been extended to include 'personal property . . . immediately associated with the person of the arrestee[.]'"[11] The court agreed with Bembury's assertion that his backpack was more akin to the 200 lbs. double locked footlocker that the U.S. Supreme Court held could not be searched without a warrant in *United States v. Chadwick* than other items on an arrestee's person that the Supreme Court and lower federal courts have held can be searched incident to arrest such as a cigarette packet, a billfold and address book, a wallet, and a purse.[12] The court reasoned that although "the backpack was portable and Bembury had control over it throughout the time he was observed by the police . . . a backpack is functionally distinguishable from a cigarette packet, wallet, address book or even a purse" because "[l]ike luggage, it is intended as a repository of personal effects . . . and is likely to contain many more items of a personal nature than the small items recovered directly from the person of an arrestee."[13]

Finally, the Court of Appeals held that there was insufficient evidence presented at the suppression hearing to nevertheless allow the evidence to be

---

[11] *Bembury*, 2021 WL 5856104, at *3 (quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991)).

[12] *Bembury*, 2021 WL 5856104, at *3.

[13] *Id.* (internal quotation marks omitted).

admitted under the inevitable discovery doctrine.[14]  Under this doctrine,

"[e]vidence unlawfully obtained by police is nevertheless admissible if the

prosecution can establish by a preponderance of the evidence that the

information ultimately or inevitably would have been discovered by lawful

means."[15]  The court reasoned that the Commonwealth did not raise its

inevitable discovery argument until after the suppression hearing in its

supplemental memorandum, and that Officer Ray testified that he did not

know if an inventory search of the backpack was conducted by the detention

center and that it was likely returned to Bembury after the synthetic

marijuana, rolling papers, and money were removed from it.[16]  Judge Taylor

concurred only with the court's result without separate opinion, and Judge

Larry Thompson dissented without separate opinion.[17]

The Commonwealth now challenges the Court of Appeals' ruling before

this Court.

## II.   ANALYSIS

The Commonwealth contends that the Court of Appeals' decision directly

conflicts with *Agee*, the opinion relied upon by the circuit court, and that it

improperly extends the U.S. Supreme Court's holding in *Chadwick*.  The

Commonwealth further asserts that the search of Bembury's backpack was

---

[14] *Id.* at *4.

[15] *Id.* (quoting *Dye v. Commonwealth*, 411 S.W.3d 227, 238 (Ky. 2013)) (internal quotation marks omitted).

[16] *Bembury*, 2021 WL 5856104, at *4.

[17] *Id.* at *5.

7

justifiable as a search incident to his lawful arrest. In the alternative, the Commonwealth argues that the evidence was admissible under the inevitable discovery doctrine.

In response, Bembury agrees that the Court of Appeals' ruling conflicts with *Agee* but argues that *Agee* was wrongly decided. He asserts that *Chadwick* is dispositive and requires this Court to hold that the search of his backpack violated his Fourth Amendment rights. He further contends that there was insufficient evidence presented by the Commonwealth to hold that the inevitable discovery doctrine applies.

## A. Standard of Review

When reviewing a trial court's ruling on a defendant's motion to suppress, an appellate court applies different standards of review to its findings of fact and conclusions of law, respectively. In accordance with those well-established standards, we must first determine whether the trial court's findings of fact were supported by substantial evidence,[18] or, "evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence . . . has sufficient probative value to induce conviction in the minds of reasonable men."[19] If the trial court's fact findings are supported by substantial evidence, then they are conclusive, and we must then "conduct a *de novo* review of the

---

[18] *See, e.g.*, *Payton v. Commonwealth*, 327 S.W.3d 468, 471 (Ky. 2010).

[19] *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (defining "substantial evidence") (internal quotation marks omitted).

8

trial court's application of the law to those facts to determine whether its decision is correct as a matter of law."[20]  *De novo* review affords "no deference to the trial court's application of the law to the established facts."[21]

As noted, the facts of this case are uncontested.  In denying Bembury's motion to suppress, the court made the following pertinent findings of fact: the investigating officers had reason to believe Bembury had previously trafficked synthetic marijuana; they observed what they believed to be a hand-to-hand synthetic marijuana transaction between Napier and Bembury that occurred in a public area; during the transaction, they saw Bembury reaching into his backpack to access the illicit substance; they stopped Napier and confirmed that the substance sold to him was synthetic marijuana based on their experience; and they arrested Bembury and searched his backpack immediately following his arrest.  We hold these facts are supported by substantial evidence and now turn to the questions of law presented.

## B. The search of Bembury's backpack was a search of his person incident to his lawful arrest and did not violate his rights against unlawful search and seizure.

The Fourth Amendment to the U.S. Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[20] *Payton*, 327 S.W.3d at 471–72.

[21] *Horn v. Commonwealth*, 240 S.W.3d 665, 669 (Ky. App. 2007).

9

In a similar manner, Section 10 of the Kentucky Constitution states that

> [t]he people shall be secure in their persons, houses, papers and possessions from unreasonable search and seizure; and no warrant shall issue to search a place, or seize any person or thing, without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.

For over a century, this Court has recognized that "there is no substantial difference between the wording of the clause in the federal and state Constitutions," and that it is therefore appropriate to look to U.S. Supreme Court precedent for guidance in construing Section 10.[22]

It is well-established under both Kentucky and U.S. Supreme Court jurisprudence that "all searches without a valid search warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant."[23] Accordingly, in order for us to hold that Bembury's Fourth Amendment rights were violated by the search of his backpack, we must find that the officers' actions constituted a search, that they acted without a warrant or consent, and that no established exception to the warrant requirement applies.[24] It is not disputed that the officer's actions constituted a search and that the search was conducted without a warrant or Bembury's consent. The dispositive question is therefore whether an exception

---

[22] *Youman v. Commonwealth*, 224 S.W. 860, 862 (Ky. 1920).

[23] *Commonwealth v. Reed*, 647 S.W.3d 237, 243 (Ky. 2022) (quoting *Cook v. Commonwealth*, 826 S.W.2d 329, 330 (Ky. 1992)). *Accord Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.").

[24] *See Reed*, 647 S.W.3d at 243.

10

to the warrant requirement applies. More specifically, whether the search was justifiable as being incident to Bembury's lawful arrest.

Recently, in *Riley v. California*,[25] which addressed whether cell phone data can be searched incident to arrest, the U.S. Supreme Court discussed the history of its cases involving the search incident to arrest exception. It began its discussion with *Chimel v. California*,[26] which it credited for "[laying] the groundwork for most of the existing search incident to arrest doctrine."[27] In *Chimel*, police officers arrested Chimel in his home and then, acting without a search warrant, proceeded to search the entirety of his three-bedroom home, including his garage and attic.[28] In addressing Chimel's appeal, the Court crafted the following rule for determining the reasonableness of a search incident to arrest:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.[29]

---

[25] 573 U.S. 373 (2014).

[26] 395 U.S. 752 (1969).

[27] *Riley*, 573 U.S. at 382-83.

[28] *Id.* at 383.

[29] *Id.* (quoting *Chimel*, 395 U.S. at 762-63).

11

The Court held that the search of Chimel's home was unlawful "because it was not needed to protect officer safety or to preserve evidence."[30]

The *Riley* Court next discussed that four years after *Chimel*, in *United States v. Robinson*,[31] the Court applied *Chimel*'s analysis within the context of a search of an arrestee's person incident to arrest.[32] In *Robinson*, a police officer arrested Robinson for driving with a revoked license, conducted a pat down search, and felt an object he could not identify in Robinson's coat pocket.[33] The officer removed the object, a crumpled cigarette packet, and discovered several heroin capsules inside.[34] The Court of Appeals held that the officer's search of Robinson was unreasonable "because Robinson was unlikely to have evidence of the crime of arrest on his person," and because "it could not be justified as a protective search for weapons."[35] The *Riley* Court said the following of the *Robinson* decision to reverse the Court of Appeals:

> This Court reversed, rejecting the notion that "case-by-case adjudication" was required to determine "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." As the Court explained, "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Instead, a "custodial arrest of a suspect based on probable cause is

---

[30] *Riley*, 573 U.S. at 383.

[31] 414 U.S. 218 (1973).

[32] *Riley*, 573 U.S. at 383.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 383-34.

12

a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."

The Court thus concluded that the search of Robinson was reasonable even though there was no concern about the loss of evidence, and the arresting officer had no specific concern that Robinson might be armed. In doing so, the Court did not draw a line between a search of Robinson's person and a further examination of the cigarette pack found during that search. It merely noted that, "[h]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled

to inspect it." A few years later, the Court clarified that this exception was limited to "personal property ... immediately associated with the person of the arrestee." *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (200–pound, locked footlocker could not be searched incident to arrest), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[36]

The Court clarified that *Robinson* is its only decision that applies *Chimel* to the search of an item found on an arrestee's person.[37] Nevertheless, it went on to note that "[l]ower courts applying *Robinson* and *Chimel* . . . have approved searches of a variety of personal items carried by an arrestee,"[38] including a billfold and address book,[39] a wallet,[40] and a purse.[41] The Court unequivocally disagreed with the government's argument that "a search of all data stored on a cell phone is 'materially indistinguishable' from searches of these sorts of

---

[36] *Id.*

[37] *Id.* at 392.

[38] *Id.*

[39] *United States v. Carrion*, 809 F.2d 1120 (5th Cir. 1987).

[40] *United States v. Watson*, 669 F.2d 1374 (11th Cir. 1982).

[41] *United States v. Lee*, 501 F.2d 890 (D.C. Cir. 1974).

physical items," stating: "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse."[42]

Finally, the *Riley* Court discussed *Gant,* which it identified as the final case in the "search incident to arrest trilogy."[43]  *Gant* addressed the circumstances under which an arrestee's vehicle may be searched incident to his or her arrest.[44]  The *Gant* Court concluded "that *Chimel* could authorize police to search a vehicle 'only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'"[45] However, the *Gant* Court added "an independent exception for a warrantless search of a vehicle's passenger compartment [and any containers therein] when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."[46]  This exception did not flow from *Chimel* and is specific to vehicle searches due to the "circumstances unique to the vehicle context."[47]

From the foregoing discussion, we discern that the U.S. Supreme Court distinguishes between and applies different standards to: (1) a search of an arrestee's person; (2) a search of the area within the arrestee's immediate control; and (3) a search of an arrestee's vehicle and the containers therein.

---

[42] *Riley,* 573 U.S. at 393.

[43] *Id.* at 384.

[44] *Id.*

[45] *Id.* at 385.

[46] *Id.* (internal quotation marks omitted).

[47] *Id.*

When an arrestee's person is searched pursuant to a valid arrest, "a search incident to the arrest requires no additional justification" because "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment," and "[i]t is the fact of the lawful arrest which establishes the authority to search[.]"[48] Stated differently, an officer may search an arrestee's person following a lawful arrest without needing to justify the search by showing it was necessary to ensure the officer's safety or to prevent the destruction of evidence because those concerns are inherent in every custodial arrest. In contrast, when an arresting officer searches the area within the arrestee's immediate control without a warrant, the search must be limited to an area from which the arrestee could either obtain a weapon or destroy evidence.[49] Finally, police may search an arrestee's vehicle if the arrestee is unsecured and can access the vehicle or if the officer has a reasonable belief that the vehicle may contain evidence of the crime of arrest.

Pertinent to this case, and as noted by the *Riley* Court, the search of an arrestee's "person" includes personal property immediately associated with the person of the arrestee so long as the search is not "remote in time or place from

---

[48] *Robinson*, 414 U.S. at 235.

[49] *Chimel*, 395 U.S. at 768 ("The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area.").

the arrest."[50]  This was the rule established by *Chadwick*, upon which the Court of Appeals' opinion below relies.

In *Chadwick*, Amtrak railroad officials in San Diego observed Gregory Machado and Bridget Leary load a 200 lbs. double locked footlocker onto a train bound for Boston.[51]  The trunk raised suspicions due to its unusually heavy weight and because it was leaking talcum powder, a substance used to mask the smell of marijuana.[52]  When the footlocker arrived in Boston, federal agents observed Machado and Leary claim the footlocker and later watched as Machado and Joseph Chadwick loaded it into the trunk of Chadwick's car while Leary waited in the car.[53]  Before the suspects closed the trunk, the agents arrested Machado, Leary, and Chadwick.[54]

The arrestees were then transported to the Federal Building in Boston while agents followed in Chadwick's car with the footlocker.[55]  The footlocker remained under the exclusive control of the officers at all times following the arrests and was ultimately placed in the Federal Building.[56]  The warrantless search of the trunk was not conducted by the officers until an hour and a half after the arrests; a large amount of marijuana was found.[57]  Chadwick,

---

[50] *Chadwick*, 433 U.S. at 15.

[51] *Id*. at 3.

[52] *Id*.

[53] *Id*. at 4.

[54] *Id*.

[55] *Id*.

[56] *Id*.

[57] *Id*. at 4-5.

16

Machado, and Leary were charged with possession of marijuana with intent to distribute and conspiracy and moved to suppress the evidence found in the footlocker.[58]  The district court granted the motion, and the Court of Appeals affirmed on the basis that the search was not justified as a search incident to lawful arrest.[59]

The U.S. Supreme Court affirmed.[60]  The Court began by rejecting the government's contention that the Fourth Amendment Warrant Clause only protects an individual's home.[61]  The Court reiterated its previous tenet that "the Fourth Amendment protects people, not places[.]"[62]  Specifically, "it protects people from unreasonable government intrusions into their legitimate expectations of privacy."[63]  The Court held that

> [b]y placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination.  No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause.  There being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides.[64]

The Court also rejected the Government's argument "that the Constitution permits the warrantless search of any property in the possession

---

[58] *Id.*

[59] *Id.* at 5-6.

[60] *Id.* at 6.

[61] *Id.* at 6-7.

[62] *Id.* at 7 (quoting *Katz,* 389 U.S. at 351) (internal quotation marks omitted).

[63] *Chadwick,* 433 U.S. at 7.

[64] *Id.* at 11.

17

of a person arrested in public, so long as there is probable cause to believe that the property contains contraband or evidence of crime," and that the search of the footlocker was reasonable because it was seized contemporaneously with the arrests and was searched as soon as "practicable" thereafter.[65]  The Court opined that "the reasons justifying search in a custodial arrest are quite different" because "there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed."[66] Accordingly,

> [s]uch searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. **The potential dangers lurking in all custodial arrests make warrantless searches of items within the "immediate control" area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved**. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) . . . However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest, . . . or no exigency exists. **Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest**.[67]

The Court held that "[h]ere the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after

---

[65] *Id*. at 14.

[66] *Id*.

[67] *Id*. at 14-15 (internal citations and quotation marks omitted) (emphasis added).

respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest[.]"[68]

With the foregoing precedents in mind, the issue now before this Court is whether the search of Bembury's backpack was justifiable as a search incident to his lawful arrest. To resolve this issue, we must decide, as a matter of first impression, whether Bembury's backpack was an item of "personal property . . . immediately associated with [his] person,"[69] or whether it was "the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."[70] If the backpack is properly considered part of Bembury's "person," then the search was lawful as no additional justification for the search other than it being incident to his arrest was needed. However, if the backpack was instead "the area within his immediate control," we would then need to address whether the search of the backpack was justified based on officer safety or the preservation of evidence.

As the U.S. Supreme Court has not yet directly opined on this issue, lower federal and state courts have been left to our own devices in determining how to draw the line between what constitutes a "*Robinson* search" of an arrestee's person and a "*Chimel* search" of the area within an arrestee's immediate control when a portable container capable of carrying items—

---

[68] *Id.* at 15.

[69] *Id.*

[70] *Riley,* 573 U.S. at 383 (quoting *Chimel*, 395 U.S. at 762-63).

19

purses, backpacks, suitcases, briefcases, gym bags, computer bags, fanny packs, etc.—are concerned. Unsurprisingly, there is little uniformity to speak of in the manner in which our nation's courts have addressed this issue. Indeed, many have not yet parsed the issue in those exact terms. One test, however, has gained some traction in a handful of jurisdictions and we believe its adoption in this Commonwealth will provide uniformity and clear authority for our bench, bar, and law enforcement in determining when such items may lawfully searched incident to arrest.

The test, as coined by the Washington Supreme Court, is known as the "time of arrest" rule. Washington's highest court explicitly adopted this test in *State v. Byrd*.[71] In that case, Lisa Byrd was a passenger in a stolen vehicle that was stopped by the police.[72] An officer arrested Byrd while she was sitting in the passenger seat with her purse on her lap.[73] Before removing her from the vehicle, the officer took her purse and sat it on the ground nearby.[74] The officer then placed Byrd in his cruiser, and returned to the purse within moments to search it; methamphetamine was found therein.[75] The trial court granted Byrd's motion to suppress the evidence found in her purse, and the Court of Appeals affirmed.[76] Relying on *Gant*, the Court of Appeals held that

---

[71] 310 P.3d 793 (Wash. 2013).

[72] *Id*. at 795.

[73] *Id*.

[74] *Id*.

[75] *Id*.

[76] *Id*.

the search was not incident to her arrest "[b]ecause Byrd was restrained and could not obtain a weapon from or destroy evidence in her purse when [the officer] searched it[.]"[77]

The Washington Supreme Court reversed. It began by discussing that unlike searches of an arrestee's surroundings or "grab area," "[t]he authority to search an arrestee's person and personal effects flows from the authority of a custodial arrest itself."[78] Moreover, it noted that "exigencies are *presumed* when an officer searches an arrestee's person," and that "[t]he search incident to arrest rule respects that an officer who takes a suspect into custody faces an unpredictable and inherently dangerous situation and that officers can and should put their safety first."[79] And, nothing in *Gant* "requires case-specific showings of officer safety or evidence preservation to justify the search of an arrestee's person," as that case only concerned "searches of the area immediately around the arrestee, not the arrestee's person."[80]

The Court then turned to the issue of whether Byrd's purse was part of her person at the time of her arrest.[81] It cited language from *Chadwick* that "[requires] *Chimel* justification only for searches of 'personal property *not* immediately associated with the person of the arrestee,'" and noted the time of

---

[77] *Id.*

[78] *Id.* at 796 (quoting *Robinson*, 414 U.S. at 232 (noting "[t]he peace officer empowered to arrest must be empowered to disarm. If he may disarm, he may search, lest a weapon be concealed[.]")).

[79] *Byrd*, 310 P.3d at 797.

[80] *Id.*

[81] *Id.*

21

arrest rule can be used "to draw a bright line between [the] two prongs of the

search incident to arrest exception."[82]  It explained:

> Under this rule, an article is "immediately associated" with the arrestee's person and can be searched under *Robinson*, if the arrestee has actual possession of it at the time of a lawful custodial arrest. . . . The time of arrest rule reflects the practical reality that a search of the arrestee's "person" to remove weapons and secure evidence must include more than his literal person.  In *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir.1981), the court explained that "[t]he human anatomy does not naturally contain external pockets, pouches, or other places in which personal objects can be conveniently carried."  When police take an arrestee into custody, they also take possession of his clothing and personal effects, any of which could contain weapons and evidence.  The time of arrest rule recognizes that the same exigencies that justify searching an arrestee prior to placing him into custody extend not just to the arrestee's clothes, however we might define them, but to all articles closely associated with his person.[83]

Importantly, the Court went on to

> caution that the proper scope of the time of arrest rule is narrow, in keeping with this "jealously guarded" exception to the warrant requirement.  **It does not extend to all articles in an arrestee's constructive possession, but only those personal articles in the arrestee's actual and exclusive possession at or immediately preceding the time of arrest. . . . Searches of the arrestee's person incident to arrest extend only to articles "in such immediate physical relation to the one arrested as to be in a fair sense a projection of his person."** *United States v. Rabinowitz*, 339 U.S. 56, 78, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting) (describing the historical limits of the exception).  Extending *Robinson* to articles within the arrestee's reach but not actually in his possession exceeds the rule's rationale and infringes on territory reserved to *Gant*[.][84]

---

[82] *Id.* at 798.

[83] *Id.* (internal citation omitted).

[84] *Id.* at 799 (internal citations omitted) (emphasis added).

Relying on this rule, the Court held that "because Byrd's purse was on her lap at the time of her arrest, it was an article on her person."[85]

Two years after *Byrd*, the Washington Supreme Court clarified what is meant by "immediately preceding the time of arrest" in *State v. Brock*.[86] In *Brock*, an officer observed Antoine Brock trespassing in a park bathroom and waited for him to exit.[87] When Brock emerged from the bathroom the officer had Brock remove the backpack he was carrying and conducted a *Terry*[88] stop and frisk.[89] The officer then had Brock walk with him to his vehicle so that he could run the identification information Brock gave him through a database.[90] For safety reasons, the officer carried Brock's backpack and placed it on the passenger seat of his vehicle while Brock stood 12-15 feet away from the truck on a curb.[91]

After determining that Brock had given him false information, the officer placed him under arrest but did not handcuff him.[92] The officer left Brock standing on the curb and returned to his vehicle to search his backpack; the

---

[85] *Id.* at 800. *See also, State v. MacDicken*, 319 P.3d 31 (Wash. 2014) (applying the time of arrest rule and upholding search of a laptop bag and rolling duffel bag that were in the possession of the arrestee when he was stopped by law enforcement).

[86] 355 P.3d 1118 (Wash. 2015).

[87] *Id.* at 1119.

[88] *See Terry v. Ohio*, 392 U.S. 1 (1968).

[89] *Brock*, 355 P.3d at 1120.

[90] *Id.*

[91] *Id.*

[92] *Id.*

officer found marijuana and methamphetamine inside.[93]  The officer then

walked back over to Brock, handcuffed him, and placed him in his vehicle.[94]

The entire encounter, from initial contact to arrest, lasted about 10 minutes.[95]

The trial court denied Brock's motion to suppress the evidence found in

his backpack, but the Court of Appeals reversed based on its conclusion that

"Brock did not have actual, exclusive possession of the backpack 'immediately

preceding' arrest."[96]  In addressing the meaning of "immediately preceding

arrest" the *Brock* Court noted that, pursuant to *Byrd*:

> [t]he time of arrest rule reflects the practical reality that a search of
> the arrestee's "person" to remove weapons and secure evidence
> must include more than his literal person.... When police take an
> arrestee into custody, they also take possession of his clothing and
> personal effects, any of which could contain weapons and
> evidence.[97]

The Court therefore rejected Brock's argument that his physical separation

from the backpack eliminated any safety or evidence preservation concerns

associated with the backpack because he could no longer reach it.[98]  It

reasoned:

> When [a] personal item is taken into custody as a part of the
> arrestee's person, the arrestee's ability to reach the item during the
> arrest and search becomes irrelevant.

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* at 1121-22.

[98] *Id.* at 1122.

Rather, the safety and evidence preservation exigencies that justify this "time of arrest" distinction stem from the safety concerns associated with the officer having to secure those articles of clothing, purses, backpacks, and even luggage, that will travel with the arrestee into custody. Because those items are part of the person, we recognize the practical reality that the officer seizes those items during the arrest. From that custodial authority flows the officer's authority to search for weapons, contraband, and destructible evidence.[99]

[...]

Although we must draw these exceptions to the warrant requirement narrowly, we do not draw them arbitrarily; the exception must track its underlying justification. **Because the search incident to arrest rule recognizes the practicalities of an officer having to secure and transport personal items as part of the arrestee's person, we draw the line of "immediately preceding" with that focus. The proper inquiry is whether possession so immediately precedes arrest that the item is still functionally a part of the arrestee's person. Put simply, personal items that will go to jail with the arrestee are considered in the arrestee's "possession" and are within the scope of the officer's authority to search**.[100]

The Court held that the search of the backpack was a lawful search incident to Brock's arrest, reasoning that "[o]nce the arrest process had begun, the passage of time prior to the arrest did not render it any less a part of Brock's arrested person."[101]

The Supreme Courts of Illinois and North Dakota, as well as the Texas Court of Criminal Appeals have adopted identical rules in determining when the search of a container constitutes a search of an arrestee's person.

---

[99] *Id.*

[100] *Id.* at 1123 (emphasis added).

[101] *Id.*

In *People v. Cregan*, the Supreme Court of Illinois upheld the search of a laundry bag and a wheeled luggage bag.[102]  The arrestee was carrying both bags when officers stopped him, arrested him, and placed him in handcuffs.[103]  The officers then searched both bags and found cocaine in one of them.[104]  The *Cregan* Court declined to define "'immediately associated' in terms of the nature or character of the object rather than in terms of the defendant's connection to the object at the time of arrest" as it felt it would result in "an unworkable rule and [produce] unpredictable results."[105]  Instead, it held that

> personal items such as cigarette packs found in pockets, wallets, or purses may be searched incident to arrest not because they are by their very nature particularly personal to the individual, but because they are in such close proximity to the individual at the time of his arrest.  In these cases, the personal nature of the object is merely a proxy for its presence in the individual's possession.  The true measure of whether an object, whether it is a cigarette pack or a suitcase, is "immediately associated" with an arrestee is whether he is in actual physical possession of the object at the time of his arrest.

> Under this test if the arrestee is, at the time of his arrest, in actual physical possession of a bag, it is immediately associated with the arrestee and is searchable, whether it is a bag of groceries being carried or wheeled in a "grannie cart," a duffle bag slung over one shoulder, or a nylon bag being pulled behind him on wheels.  The use to which the bag is being put—as luggage for a traveler or to haul dirty clothing to a laundromat—is irrelevant.  The sole consideration is whether he is in actual physical possession of the object.  If it is not in his actual physical possession, like the footlocker in *Chadwick*, a warrantless search may be justified on

---

[102] 10 N.E.3d 1196 (Ill. 2014).

[103] *Id.* at 1198.

[104] *Id.* at 1999.

[105] *Id.* at 1205.

some other basis, but not as a search of the person incident to his arrest.[106]

Similarly, in *State v. Mercier,* the Supreme Court of North Dakota adopted the time of arrest rule and upheld the search of an arrestee's backpack.[107] In *Mercier*, police responded to an attempted robbery call and stopped Claude Mercier because he matched the description provided by the victim.[108] When asked, Mercier told the officers that his identification was in his backpack at a house across the street.[109] When an officer retrieved the backpack, an individual at the home told him "This is [Mercier's]."[110] When the officer returned with the backpack Mercier confirmed that it was his, but refused to let the officers search it.[111] Instead, the officers allowed Mercier to go through the backpack slowly to retrieve his identification.[112] After running Mercier's identification through dispatch, the officers discovered that he had an active arrest warrant, arrested him, and placed him in the back of a squad car.[113] The officers then searched the backpack and found several items that had been reported stolen, methamphetamine, and drug paraphernalia.[114]

---

[106] *Id.* at 1207 (internal citations omitted).

[107] 883 N.W.2d 478 (N.D. 2016).

[108] *Id.* at 482.

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

The North Dakota Supreme Court upheld the trial court's denial of Mercier's motion to suppress. Citing *Byrd*, *Brock*, and *Creagan*, it concluded that whether a personal item should be considered part of an arrestee's person "turns on whether the arrestee had 'actual and exclusive possession at or immediately preceding the time of arrest.'"[115] The court held that "Mercier had the backpack in his immediate possession prior to being restrained because the officers were allowing him to search through it to obtain his identification."[116] The court further noted that "[h]aving no other place to store it, Mercier would have had to bring the backpack along with him into custody."[117] It reasoned that

> [i]t would be illogical to require police officers to leave the backpack on the public street without checking it, posing a threat to the public and the possibility of its being stolen. Similarly, it would be illogical for the officers to take it with them to the correctional center or police station without checking it, posing a threat to themselves, the arrestee, and the public. The officers would have been entitled—and expected—to do an inventory search on the backpack upon its arrival at the police station or correctional center. *See Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."). Such an inventory search would have uncovered the contraband found in Mercier's backpack.[118]

---

[115] *Id.* at 490.

[116] *Id.* at 492.

[117] *Id.*

[118] *Id.* at 492-93.

The Court held: "[b]ecause Mercier had the backpack in his actual possession immediately preceding his lawful arrest, we conclude a search thereof was reasonable."[119]

Finally, a plurality of Texas' highest court for criminal cases has explicitly adopted the time of arrest rule, and the Indiana Court of Appeals has at least impliedly done the same. In *Price v. State*, the Texas Court of Appeals, citing and discussing *Creagan, MacDicken, supra*, and *Mercier*, held

> at least where—as in the instant case—an arrestee is in actual possession of a receptacle at the time of, or reasonably contemporaneously to, his custodial arrest, and that receptacle must inevitably accompany him into custody, a warrantless search of that receptacle at or near the time of the arrest is reasonable under the Fourth Amendment as a search incident to the arrestee's person. Such a search requires no greater justification than the fact of the lawful arrest itself. Application of this principle does not turn on the specific nature or character of the receptacle, as the court of appeals believed, but merely on whether it was in the arrestee's possession at the time of arrest, and whether it would inevitably accompany him into custody.[120]

In *State v. Crager*, citing, but not discussing, *Mercier, Brock*, and *Creagan*, the Indiana Court of Appeals held:

> The record reveals that Crager was wearing the backpack at the time [the officer] stopped him and initiated an arrest. [The officer] asked Crager to place the backpack he was wearing on the ground. [The officer] searched the backpack at the time or very near to the time of Crager's arrest. We also note [the officer's] testimony that he could not have left the backpack with the motorcycle because it was his responsibility to protect Crager's property and secure his possessions. We conclude that the backpack was immediately associated with Crager and that the search was reasonable under

---

[119] *Id.* at 493.

[120] 662 S.W.3d 428, 438 (Tex. Crim. App. 2020).

the circumstances and did not violate Crager's rights under the Fourth Amendment.[121]

The dissent argues that the time of arrest rule provides "absolutely no limit to the items police can search as an extension of the arrestee's person. The only safeguard is that the item must be something that the police will not leave at the site of the arrest." This argument is not a fair representation of the rule's requirements and is clearly contradicted by *State v. Alexander.*[122]

In *Alexander*, the Washington Court of Appeals reversed the trial court's denial of Heather Alexander's motion to suppress based on its determination that "the State failed to establish that Alexander had actual and exclusive possession of [a] backpack at or immediately preceding her arrest[.]"[123] An officer responding to a trespassing report approached Alexander and a male individual, Delane Slater, while they were sitting in a field marked with "no trespass" signs.[124] After the officer informed the pair that they were trespassing he conducted a record's check on Alexander and discovered she had an active Department of Corrections (DOC) warrant, but Slater did not.[125]

While speaking to Alexander, the officer noticed a pink backpack sitting directly behind Alexander which she indicated belonged to her.[126] Based on

---

[121] 113 N.E.3d 657, 663-64 (Ind. Ct. App. 2018).

[122] 449 P.3d 1070 (Wash. 2019).

[123] *Id.* at 1071.

[124] *Id.*

[125] *Id.* at 1072.

[126] *Id.*

Alexander's DOC warrant, the officer placed her under arrest.[127]  As Slater was free to leave, he offered to take her backpack with him, and she indicated to the officer that she wanted him to take it.[128]  The officer would not let him take the backpack and stated that it would be searched incident to Alexander's arrest and therefore had to remain with her.[129]  The officer walked Alexander and the backpack to his patrol vehicle and searched the backpack while it was on the top of the truck after placing Alexander in the back seat of the vehicle and found a controlled substance in it.[130]

The Washington Court of Appeals held that the search of the backpack was not a search of Alexander's person incident to her arrest.[131]  The court noted that unlike the facts of *Byrd*, *MacDicken*, and *Brock*, where the arrestee's were each seen carrying or holding the container at issue, "Alexander's backpack was merely sitting behind her at the time of her arrest.  The State points to no evidence that Alexander was holding, wearing, or carrying the backpack at any time during her contact with [the officer]."[132]  Moreover, "[the officer] himself testified that no one had reported seeing Alexander carrying the

---

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.* at 1075.

backpack at an earlier time."[133]  Therefore, the trial court's findings established

"*at most*, that Alexander could immediately have reduced the backpack to her

actual possession, i.e., that Alexander had dominion and control—and thus

*constructive* possession—over the backpack."[134]  In addition, the State had not

shown that the backpack was an item that would *necessarily* travel with

Alexander to jail:

> Slater, about whom [the officer] expressed no safety concerns, offered to take the backpack, and Alexander desired that Slater take it.  Under these circumstances, Alexander's backpack was not an item immediately associated with her person that would *necessarily* travel to jail with her.  Rather, the only reason the backpack traveled to jail with Alexander was because [the officer] decided that it would.  But the scope of the arrestee's person is determined by what must *necessarily* travel with an arrestee to jail, not what an officer *decides* to take to jail. [135]
>
> [...]
>
> In short, the trial court expanded the arrestee's person to include any item in proximity to and owned by the arrestee if it is reasonable for the arresting officer to take the item to jail.  But as discussed, the arrestee's person is limited to those items that are within the arrestee's actual and exclusive possession at or immediately preceding the time of arrest, and the State cites no authority for the proposition that proximity and ownership alone constitute actual and exclusive possession.[136]

We therefore disagree with the dissent's assertion, as the time of arrest rule

requires both that an arrestee have actual and exclusive, as opposed to

---

[133] *Id.*

[134] *Id.*

[135] *Id.* at 1076.

[136] *Id.* at 1077.

constructive, possession at or immediately preceding the time of arrest and that that the item must necessarily travel with them to jail.

One of the only courts to expressly reject the time of arrest rule is the Federal Court of Appeals for the Tenth Circuit in an opinion cited by the dissent: *United States v. Knapp.*[137]  The *Knapp* Court rejected the rule based on its conclusion that, under *Robinson,* a search of an arrestee's person can never include any item not found within the arrestee's clothing:

> To the extent the government suggests a construction that includes more than the arrestee's immediate person, worn clothing, or containers concealed within her clothing, we decline to adopt it. . . . The better formulation, we believe, would be to limit *Robinson* to searches of an arrestee's clothing, including containers concealed under or within her clothing.  Accordingly, visible containers in an arrestee's hand such as Ms. Knapp's purse are best considered to be within the area of an arrestee's immediate control — thus governed by *Chimel* — the search of which must be justified in each case.

Respectfully, we cannot agree that what constitutes an arrestee's person should be limited in this manner.  We again acknowledge that the U.S. Supreme Court has not yet spoken on the issue, which of course means there is no holding from that Court stating that an arrestee's person *cannot* include loose containers carried outside an arrestee's clothing.  And several statements from the Court, albeit in dicta, strongly suggest that it would consider the search of an arrestee's "person" to include loose containers carried outside of an arrestee's clothing.

---

[137] 917 F.3d 1161 (10th Cir. 2019).

In addition to the excerpt from *Riley* quoted below, *Chadwick* provides that the search of property is no longer incident to arrest "once law enforcement officers have reduced **luggage or other personal property not immediately associated with the person of the arrestee** to their exclusive control[.]"[138]  This statement implies that personal property, such as luggage, that is immediately associated with an arrestee could be searched incident to arrest.  Most recently, in *Birchfield v. North Dakota*, the Court noted that

> [o]ne Fourth Amendment historian has observed that, prior to American independence, "[a]nyone arrested could expect that not only his surface clothing but his body, **luggage, and saddlebags** would be searched and, perhaps, his shoes, socks, and mouth as well." W. Cuddihy, The Fourth Amendment: Origins and Original Meaning 602–1791, p. 420 (2009).
>
> No historical evidence suggests that the Fourth Amendment altered the permissible bounds of arrestee searches.[139]

Additionally, we do not believe that the Court would find an arrestee's privacy interests in such containers to be significant enough that a search would constitute more than a minor additional intrusion in relation to the arrest itself.  As discussed, searches of an arrestee's "person" pursuant to his or her lawful arrest is an exception to the warrant requirement that does not require justification based on officer safety or the preservation of evidence.  That is, unless "privacy-related concerns are weighty enough" that the search constitutes are more than a "minor additional [intrusion] compared to the substantial government authority exercised in taking [an arrestee] into

---

[138] *Chadwick*, 433 U.S. at 15 (emphasis added).

[139] 579 U.S. 438, 458 (2016) (emphasis added).

34

custody."[140]  Previous instances of a search being "a substantial invasion

beyond the arrest itself"[141] were the top to bottom search of a house in *Chimel*

and the search of two arrestees' cellphones in *Riley*.  In contrast, in *Maryland*

*v. King*, the Court held that the "the need of law enforcement officers in a safe

and accurate way to process and identify persons and possessions taken into

custody" outweighed an arrestee's privacy interest in his own DNA.[142]

    We therefore disagree with the dissent's argument that the search of an

unlocked backpack should be considered on par with the privacy interests in

cases like *Chimel* and *Riley* such that an exception to the warrant requirement

is trumped.  As the U.S. Supreme Court said itself in *Riley*:

> Robinson is the only decision from this Court applying *Chimel* to a
> search of the contents of an item found on an arrestee's person.  In
> an earlier case, this Court had approved a search of a zipper bag
> carried by an arrestee, but the Court analyzed only the validity of
> the arrest itself. *See Draper v. United States*, 358 U.S. 307, 310–
> 311, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).  Lower courts applying
> *Robinson* and *Chimel*, however, have approved searches of a variety
> of personal items carried by an arrestee.  *See, e.g., United States v.
> Carrion*, 809 F.2d 1120, 1123, 1128 (C.A.5 1987) (billfold and
> address book); *United States v. Watson*, 669 F.2d 1374, 1383–1384
> (C.A.11 1982) (wallet); *United States v. Lee*, 501 F.2d 890, 892
> (C.A.D.C.1974) (purse).
>
> **The United States asserts that a search of all data stored on a
> cell phone is "materially indistinguishable" from searches of
> these sorts of physical items.**  That is like saying a ride on
> horseback is materially indistinguishable from a flight to the moon.
> Both are ways of getting from point A to point B, but little else
> justifies lumping them together.  **Modern cell phones, as a
> category, implicate privacy concerns far beyond those**

---

[140] *Riley*, 573 U.S. at 391-92.

[141] *Id*. at 392.

[142] 569 U.S. 435, 438 (2013) ("The government interest is not outweighed by
respondent's privacy interests.").

**implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items**, but any extension of that reasoning to digital data has to rest on its own bottom.[143]

Accordingly, we simply cannot agree that the search of an unlocked backpack that was part of an arrestee's person at the time of arrest constitutes such a substantial invasion beyond the arrest itself that a warrant is required to search it. On that front, it is important to highlight that, contrary to the dissent's assertion that, "based on the Majority rule, any container, regardless of . . . whether it is locked" may be searched incident to arrest is not at issue in the case now before us. While we agree that in accordance with *Chadwick*, the fact that a container is locked may result in a heightened privacy interest, the container at issue in this case was not locked. In addition, the fact that the footlocker in *Chadwick* was locked was only part of the Supreme Court's basis for invalidating the search. The Court's primary holding was that "warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the '**search is remote in time or place from the arrest**[.]'"[144] Whereas the search of Bembury's backpack occurred immediately after, and in the same location as, his arrest. Additional consideration must also be given to the fact that, in this case, Bembury was

---

[143] *Id.* at 392-93 (emphasis added).

[144] *Chadwick*, 433 U.S. at 15 (emphasis added).

pulling illegal items out of his backpack in a public place and in the plain view of the officers.

Based on the foregoing discussion, we conclude that a container capable of carrying items, such as a backpack, can be considered part of an arrestee's "person" for the purposes of a search incident to lawful arrest. And, until the U.S. Supreme Court speaks on the matter, the time of arrest rule is a well-reasoned and common-sense way to determine whether such a container is considered part of an arrestee's person and therefore subject to being searched. Accordingly, we hold that to be considered part of an arrestee's person, a container must be in the arrestee's actual and exclusive possession, as opposed to constructive possession, at or immediately preceding the time of arrest such that the item must necessarily accompany the arrestee into custody.

In accordance with this standard, we hold that the Bembury's backpack was part of his person at the time of his arrest. Although we assume that Bembury was carrying his backpack when the officers initially spotted him, the trial court's fact findings are silent in that regard. However, the trial court's findings do state that the officers "observed Napier hand [Bembury] U.S. Currency in an unknown amount, which [Bembury] placed inside his backpack. Officer Ray then observed [Bembury remove] a white paper from his backpack, sprinkle a substance inside it, roll it up and hand it to Napier." Like the arrestee in *Mercier*, Bembury's actions in putting items into and taking items out of the backpack established his actual and exclusive, rather than

37

constructive, possession of it. There was no suggestion that the backpack belonged to anyone other than Bembury, and it was still with him when Officer Ray returned to the courtyard to arrest him. Furthermore, as the officers could not have simply left Bembury's backpack in the courtyard, it was an item that necessarily and inevitably would have accompanied him to jail. And of course, we should not, and cannot, expect officers to either leave behind, or blindly transport within their vehicles, potentially dangerous or deadly contraband.

The Court of Appeals was therefore incorrect in holding that the search of Bembury's backpack was an impermissible search of the area within his immediate control and in holding that the search was a substantial invasion of privacy rather than a minor additional intrusion, and we reverse. But, to clarify, although we hereby reinstate the circuit court's order denying Bembury's motion to suppress we do so for different reasons.[145] The circuit court relied upon the *Gant* rule that allows a vehicle to be searched incident to arrest without a warrant "if it is reasonable to believe the vehicle contains evidence of the offense arrest"[146] to hold that the search of Bembury's backpack was lawful because the officers had such reasonable belief. But that holding applies exclusively to vehicle searches and not searches of an arrestee's person. But, as we have explained, the search was nevertheless lawful because it was the search of a container that was in Bembury's actual and exclusive

---

[145] *See, e.g., Wells v. Commonwealth*, 512 S.W.3d 720, 721–22 (Ky. 2017) ("Even if a lower court reaches its judgment for the wrong reason, we may affirm a correct result upon any ground supported by the record.").

[146] *Gant*, 556 U.S. at 351.

possession immediately preceding his arrest which would necessarily have to accompany him to jail.

Because we hold that the search was a lawful search incident to Bembury's arrest, we decline to address the parties' arguments regarding the inevitable discovery doctrine.

## III.    CONCLUSION

For the foregoing reasons, the Court of Appeals decision is hereby reversed and the Fayette Circuit Court's order denying Bembury's motion to suppress is reinstated.

Bisig, Conley, Keller, Lambert, Nickell and Thompson, JJ.; sitting.  Bisig, Conley, and Nickell, JJ; concur. Nickell, J., concurs by separate opinion. Keller, J., dissents by separate opinion in which Thompson, J., joins. Thompson, J., dissents by separate opinion. VanMeter, C.J., not sitting.

NICKELL, J., CONCURRING.  While I fully concur with the majority's well-reasoned opinion, I write separately to emphasize my position that Bembury's use of his backpack as a public dispensary for synthetic marijuana obviated the requirement for a search warrant under the plain view exception.

"The Fourth Amendment protects legitimate expectations of privacy rather than simply places." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Florida v. Riley*, 488 U.S. 445, 449 (1989) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).

39

Similarly, in *Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13 (1979), the

Supreme Court explained:

> Not all containers and packages found by police during the course
> of a search will deserve the full protection of the Fourth
> Amendment. Thus, some containers (for example a kit of burglar
> tools or a gun case) by their very nature cannot support any
> reasonable expectation of privacy because their contents can be
> inferred from their outward appearance. Similarly, in some cases
> the contents of a package will be open to "plain view," thereby
> obviating the need for a warrant.

"The plain view doctrine is grounded on the proposition that once police are

lawfully in a position to observe an item first-hand, its owner's privacy interest

in that item is lost; the owner may retain the incidents of title and possession

but not privacy." *Andreas*, 442 U.S. at 771. In other words, "courts will allow

a search of a container following its plain view seizure only 'where the contents

of a seized container are a foregone conclusion.'" *United States v. Williams*, 41

F.3d 192, 197 (4th Cir. 1994). To determine "whether the contents of a

container are a foregone conclusion, the circumstances under which an officer

finds the container may add to the apparent nature of its contents." *Id.*

The rationale of the *Andreas* and *Williams* decisions applies equally to

the present appeal. After the officers observed Bembury complete the drug

transaction in full public view such that the officers were justified in effecting

his immediate arrest, it was a foregone conclusion that the backpack used to

facilitate the transaction contained the fruits of the same illegal activity. This

unambiguous knowledge was based on the officers' first-hand,

contemporaneous observations as opposed to mere suspicion or subjective

40

belief. Thus, the present situation is distinguishable from those where police merely happen upon a closed container during the course of a lawful arrest or search. Accordingly, this Court should not countenance Bembury's assertion of a legitimate expectation of privacy where, as the majority noted, he "was pulling illegal items out of his backpack in a public place and in the plain view of the officers."

Inasmuch as reasonableness is the touchstone for any Fourth Amendment analysis, "[w]hen all else is said and done, common sense must not be a stranger in the house of the law." *Cantrell v. Kentucky Unemployment Ins. Comm'n*, 450 S.W.2d 235, 237 (Ky. 1970). "[R]equiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property or incriminating evidence generally would be a 'needless inconvenience,' . . . that might involve danger to the police and public." *Texas v. Brown*, 460 U.S. 730, 739 (1983). In the present appeal, upon witnessing the public perpetration of a crime, the officers were justified to search and seize the instrumentality of the offense without a warrant. Therefore, I concur with the majority and would further hold that Bembury waived any legitimate expectation of privacy by opening the illegal contents of his backpack to public view.

KELLER, J., DISSENTING: I agree with much of the Majority's well-written Opinion. I disagree with the Majority, however, on a critical point: what constitutes personal property "immediately associated with the person" of the arrestee. As the Majority notes, this is a question that the Supreme Court of

41

the United States has yet to answer but that we are directly confronted with today. Federal circuit courts of appeals as well as state courts that have addressed this issue are split. We now have, not only an opportunity, but an obligation to weigh in on this important issue. In doing so, we are reminded that "the right of privacy [is] one of the unique values of our civilization" and must be protected as such. *McDonald v. United States*, 335 U.S. 451, 453 (1948).

To make this determination, I believe that we must undertake the balancing test described in *Riley v. California*, 573 U.S. 373, 385 (2014) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999)). On the one hand, we must weigh the governmental interests at stake, as informed by the justifications for the search incident to arrest exception to the warrant requirement as described in *Chimel v. California*, 395 U.S. 752, 762–63 (1969). On the other hand, we must weigh the individual's privacy interests. I believe that in the situation before us, the individual's privacy interest outweighs the governmental interest in searching personal property without a warrant.

Relying on decisions from several other state courts, the Majority, however, sets forth the following rule: "[T]o be considered part of an arrestee's person, a container must be in the arrestee's actual and exclusive possession . . . at or immediately preceding the time of arrest such that the item must necessarily accompany the arrestee into custody." As *State v. Mercier* explains, "[p]ut simply, personal items that will go to jail with the arrestee are considered in the arrestee's 'possession' and are within the scope of the officer's authority

42

to search." 883 N.W.2d 478, 491 (N.D. 2016) (quoting *State v. Brock*, 355 P.3d 1118, 1123 (Wash. 2015)). The *Mercier* court justified extending the search of an arrestee's person to the items that will go to jail with him by explaining,

> It would be illogical to require police officers to leave the backpack on the public street without checking it, posing a threat to the public and the possibility of its being stolen. Similarly, it would be illogical for the officers to take it with them to the correctional center or police station without checking it, posing a threat to themselves, the arrestee, and the public.

*Id.* at 492–93.

At first glance, this reasoning appears sound; however, upon closer inspection, it falls apart. This rule and its corresponding justification provide absolutely no limit to the types of items police can search as an extension of an arrestee's person. The Majority seems to admit as much. The only safeguard is that the item must be something that is in the arrestee's possession and that the police will not leave at the site of the arrest. I do not see why the 200-pound, double-locked footlocker at issue in *United States v. Chadwick* would not fall within this rule, had police stopped the arrestees before they reached the car in which they placed the footlocker. 433 U.S. 1 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). The footlocker was in the possession of the arrestees, and police would not have left it in the middle of a train station parking lot. Thus, it would have been subject to search under the Majority's rule as an extension of the person of the arrestees despite the clear "manifest[ation of] an expectation that the contents would remain free from public examination." *Id.* at 11. Even though "one who

safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant clause" "[n]o less than one who locks the doors of his home against intruders," a double-locked footlocker would be subject to a warrantless search if it was in the arrestee's actual possession at or immediately preceding his arrest. *Id.* This cannot be what the United States Supreme Court intended when it set forth the search incident to arrest exception to the warrant requirement.

The state courts cited by the Majority, as well as the Majority itself in this case, all fail to undertake the balancing test as **required** by *Riley v. California,* 573 U.S. at 385. Under that test, we must weigh "'on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* (quoting *Houghton,* 526 U.S. at 300). For the reasons set forth below, I believe that a weighing of these interests results in the necessity of obtaining a warrant in a case such as the one at bar. I further note, as will be more fully addressed below, **that the existence of probable cause to search an item does not eliminate the warrant requirement.**

I believe that to answer the critical question of what is personal property immediately associated with the person, we must look to the original justifications underlying the search of a person incident to his or her arrest. The Supreme Court of the United States explained,

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered,

44

and the arrest itself frustrated. In addition, it is entirely reasonable
for the arresting officer to search for and seize any evidence on the
arrestee's person in order to prevent its concealment or
destruction.

*Chimel*, 395 U.S. at 762–63. Thus, "[t]he rule allowing contemporaneous searches is justified . . . by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime." *Id.* at 764 (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)). More recently, the Supreme Court has acknowledged that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (citation omitted).

In evaluating how these justifications apply, I am cognizant of the fact that the United States Supreme Court has rejected a case-by-case evaluation of the application of the search of the person incident to his arrest exception to the warrant requirement in favor of a categorical approach. That Court has explained,

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

45

*United States v. Robinson,* 414 U.S. 218, 235 (1973). Thus, the lawfulness of a search incident to arrest of the person of the arrestee does not depend on the reasonableness of a particular search under particular circumstances but instead depends on whether the category of thing to be searched (such as the clothes the arrestee is wearing or the backpack he is carrying) is exempt from the warrant requirement.

With this in mind, I must determine whether these justifications apply to a backpack (or, based on the Majority rule, any container, regardless of size, weight, or whether it is locked) that is in the actual possession of an arrestee at the time of, or immediately preceding, his arrest. After a thorough review of the law, I do not believe they do. I believe that to apply "the search incident to arrest doctrine to this particular category of effects would 'untether the rule from the justifications underlying the *Chimel* exception.'" *Riley,* 573 U.S. at 386–87 (quoting *Gant,* 556 U.S. at 343).

In order to determine whether *Chimel*'s justifications for a search incident to arrest apply to a backpack and thus exempt a search of the backpack from the warrant requirement, we must undertake the balancing test required by *Riley.* 573 U.S. 373. In doing so, we weigh "'on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 385 (quoting *Houghton,* 526 U.S. at 300). "On the government interest side, *Robinson* concluded that the two risks identified

in *Chimel*—harm to officers and destruction of evidence—are present in all custodial arrests." *Id.* at 386. With this premise, I agree. However, *Robinson*

> also quoted with approval then-Judge Cardozo's account of the historical basis for the search incident to arrest exception: "Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting **the body** of the accused to its physical dominion."

*Id.* at 391–92 (emphasis added) (quoting *Robinson*, 414 U.S. at 232 (quoting *People v. Chiagles*, 142 N.E. 583, 584 (N.Y. 1923))).

The gravity of the governmental interests at stake in a search incident to arrest is tied closely to the height of the risks of harm to officers and destruction of evidence which justify the exception to the warrant requirement. Integral to my opinion that a backpack is not an item immediately associated with the person of an arrestee is the fact that a backpack can easily be separated from the person of the arrestee without degradation in a way that clothing cannot. As the Tenth Circuit Court of Appeals explained, "Because of an arrestee's ability to always access weapons concealed in her clothing or pockets, an officer must necessarily search those areas because it would be impractical (not to mention demeaning) to separate the arrestee from her clothing." *United States v. Knapp*, 917 F.3d 1161, 1166–67 (10th Cir. 2019) (citing *United States v. Edwards*, 415 U.S. 800, 803 (1974)). Conversely, once a backpack is separated from the person of the arrestee, "there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence." *Chadwick*, 433 U.S. at 15. Thus, the justifications of the

47

search incident to arrest exception to the warrant requirement no longer apply, and the governmental interests at stake are low.

On the individual privacy side of the equation lies the fact that "any privacy interests retained by an individual after arrest [are] significantly diminished by the fact of the arrest itself." *Riley*, 573 U.S. at 386. However, "[t]he fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely . . . . [W]hen 'privacy-related concerns are weighty enough' a 'search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee.'" *Id.* at 392 (quoting *Maryland v. King*, 569 U.S. 435, 463 (2013)).

I assert that the privacy interests are much higher in the contents of a backpack than they are in the contents of the pockets of an arrestee's clothing when he is taken into custody. Like the contents of luggage, the contents of a backpack "are not open to public view," and backpacks are "intended as a repository of personal effects." *Chadwick*, 433 U.S. at 13. People carry all kinds of personal items in their backpacks of which they do not intend the public to have knowledge and to which they do not intend the public to have access. These items could include things as personal as journals containing a person's innermost convictions, medications indicating one's physical health history or even mental health diagnoses, hygiene products, or checkbooks and other financial records evincing one's political, religious, and other personal affiliations. The possibilities are limitless, because, under the Majority's rule, the size or type of container does not matter. By placing items in an opaque,

48

zipped-up backpack, individuals have a reasonable expectation that those items will remain private.

After weighing the governmental interest against an individual's privacy interest, it is clear to me that the individual's privacy interest is more significant. Additionally, as the United States Supreme Court held in *Chadwick*, "[W]hen no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority." *Id.* at 15. As the Tenth Circuit concluded, "[A] holding to the contrary would erode the distinction between the arrestee's person and the area within her immediate control." *Knapp*, 917 F.3d at 1167. Therefore, I would hold that a backpack is not personal property immediately associated with the person of the arrestee such that police could search it without a warrant. Accordingly, I would affirm the Court of Appeals.

The police in this case could have and should have obtained a warrant to search Bembury's backpack. They certainly had probable cause to do so, but the existence of probable cause does not eliminate the warrant requirement. We must remember "that the warrant requirement is 'an important working part of our machinery of government,' not merely 'an inconvenience to be somehow "weighed" against the claims of police efficiency.'" *Riley*, 573 U.S. at 401 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971)). As the Supreme Court explained in *Johnson v. United States*,

49

The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a **neutral and detached** magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime . . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

333 U.S. 10, 13–14 (1948) (emphasis added) (footnote omitted).

I note that if the police had reason to believe an exigency existed that justified an immediate, warrantless search of the backpack, they could have conducted such a search. However, whether an exigency exists must be determined on a case-by-case basis and not through a categorical exception to the warrant requirement. *See Riley*, 573 U.S. at 388 ("To the extent dangers to arresting officers may be implicated in a particular way in a particular case, they are better addressed through consideration of case-specific exceptions to the warrant requirement, such as the one for exigent circumstances." (citation omitted)). In this case, the Commonwealth did not argue that any exigency existed to justify the warrantless search of Bembury's backpack, and there was no testimony regarding any exigency.

Finally, I note that it is more likely than not that Bembury's backpack would have been searched and the content inventoried upon his booking into the local jail. During this search, the evidence at issue would have been discovered, implicating the inevitable discovery exception to the exclusionary rule. However, this record is completely void of any of the aforementioned

testimony, and therefore, I cannot hold that the evidence would have been inevitably discovered.

Thompson, J., joins.

Thompson, J., DISSENTING. I respectfully dissent from the majority's wholesale repeal of all reasonable limits on warrantless baggage searches incident to arrest and urge a return to the standards elucidated in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d. 685 (1969), and *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 1719, 173 L. Ed. 2d 485 (2009), which prohibit searches of containers that are no longer accessible to arrestees.

Bembury was arrested for the sale of a $5.00 cigarette which officers could only assume contained synthetic marijuana. *After* he was arrested, handcuffed, and placed in the back of a police car, officers searched his backpack and found a small quantity of what they again suspected was synthetic marijuana, some cigarette rolling papers, a total of seven one-dollar bills, and his life's possessions. Bembury entered a plea of guilty to a charge of possession of synthetic drugs, second offense, and received a sentence of two years and one day – all for a five-dollar transaction.

The warrantless search of Bembury's backpack constituted an unlawful search under the Fourth Amendment of the United States Constitution and Section Ten of Kentucky's Constitution. The majority's opinion is a clear departure not only from precedent but from the tide of jurisprudence which seeks to ensure the same rights from intrusive government action for the impoverished as it does the wealthy who are more financially able to secure

51

their personal effects. A warrant could have, and should have, been acquired prior this search.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its "ultimate touchstone . . . is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 381–82, 134 S. Ct. 2473, 2482, 189 L. Ed. 2d 430 (2014).

All citizens clearly have an interest in the privacy of the contents of their luggage, briefcases, handbags or any other containers that conceal private papers and effects from public scrutiny. The majority opinion upholds the search of Bembury's backpack as reasonable as part of his search incident to arrest. The United States Supreme Court has clearly set forth the limits of the search-incident-to-arrest exception, emphasizing that it is "reasonable" for arresting officers to search the person being arrested and ***only*** the area within his reach (1) "in order to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape" and (2) "in order to prevent [the] concealment or destruction" of evidence. *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040. The Court also concluded the area "within [arrestee's] immediate control," only meant the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763.

52

In *Gant*, 556 U.S. at 343, 129 S. Ct. at 1719, the United States Supreme Court upheld the continued importance of *Chimel* prohibiting any search incident to arrest of an area beyond the arrestee's immediate control, holding that "the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."[147]

In *United States v. Davis*, 997 F.3d 191, 198 (4th Cir. 2021), the Fourth Circuit had to decide whether a backpack was properly searched incident to arrest. Davis had fled from police on foot while carrying his backpack but dropped it just before he lay down and surrendered. His backpack was not searched until he was already under arrest, handcuffed with his hands behind his back, and lying on his stomach. The Court ruled that the warrantless search of the backpack was not justified as a search incident-to-arrest under the Fourth Amendment because the arrestee could not access his backpack at the time of the search. *Davis*, 997 F.3d at 197-98.

Similarly, in *United States v. Knapp*, 917 F.3d 1161 (10th Cir. 2019), the Court determined that a search of a purse carried by arrestee at time of her arrest does not qualify as search of the arrestee's person incident-to-arrest for

---

[147] *Gant* contains a second holding for which it is more commonly cited, that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" 556 U.S. at 343, 129 S. Ct. at 1719 (quoting *Thornton v. United States*, 541 U.S. 615, 632, 124 S.Ct. 2127, 2137, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring in judgment)).

Fourth Amendment purposes since, being under arrest and restrained, the purse was no longer in "an area within her immediate control," stating that, "[t]o the extent the government suggests a construction that includes more than the arrestee's immediate person, worn clothing, or containers concealed within her clothing, we decline to adopt it." *Id.* at 1167.

I agree with the reasoning in *Davis* and *Knapp* as being an accurate interpretation of what our Constitution requires. Once separated from his backpack by the officers, I cannot agree with the legal fiction that the backpack remained a part of Bembury's "person" subject to search without a warrant.

Without the justification of a search incident to arrest, there is no acceptable basis for searching Bembury's backpack. At the time of the search, Bembury had been arrested, handcuffed and was in custody in the back of a police car. Any exigency had vanished by that time. Further, no contraband was in plain sight; all subsequently discovered evidence being secured inside the backpack. Here, Bembury's backpack could certainly be seized incident to arrest *but not searched*, without a warrant.

While this discussion would apply to all citizens equally, I am especially cognizant that there are some people who, as a result of circumstances, are compelled to carry all their physical belongings along with them and the conveyances in which they transport such items are indeed "repositories of personal effects."[148] Such persons do not have the luxury of fences, doors, and

---

[148] The record is not entirely clear as to whether Bembury was homeless or simply had limited means.

locks found in traditional residences wherein they can secure their possessions and are dependent upon suitcases, backpacks, grocery carts and even garbage bags to secure their personalty. For these citizens, such possessions may contain all "the privacies of life" which for another citizen might be stored in a house. *Riley,* 573 U.S. at 403, 134 S. Ct. at 2494-95 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). Our protections against warrantless searches are not supposed to end at the doorstep of a home. I assert that our most vulnerable are the most deserving of protection from unconstitutional intrusion.

Accordingly, I would affirm the Court of Appeals' determination that the warrantless search of Bembury's backpack was impermissible and the evidence obtained therefrom should have been suppressed.

COUNSEL FOR APPELLANT:

Daniel J. Cameron
Attorney General of Kentucky

Mathew Robert Krygiel
Assistant Attorney General

Lou Anna Red Corn
Assistant Commonwealth Attorney


COUNSEL FOR APPELLEE:

Aaron Reed Baker
Assistant Public Advocate
Department of Public Advocacy

Kathleen Kallaher Schmidt
Assistant Public Advocate
Department of Public Advocacy